United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Maxim Integrated Products, Inc., | NO. C 09-00514 JW |
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| Richard Quintana, et al., | |
| Defendants. | |

## I. INTRODUCTION

Maxim Integrated Products, Inc. ("Plaintiff") brings this action against Richard Quintana ("Quintana") and My-iButton, LLC ("My-iButton") (collectively, "Defendants"), alleging, *inter alia*, trademark infringement and false advertising under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a). Plaintiff alleges that Defendants deliberately advertise, market and use a product with a confusingly similar trademark to that of Plaintiff's incontestable iButton marks.

Presently before the Court is Plaintiff's Motion for Preliminary Injunction.[1] The Court conducted a hearing on July 6, 2009. Based on the papers submitted to date and oral argument, the Court GRANTS Plaintiff's Motion for Preliminary Injunction.

---

[1] (Plaintiff Maxim Integrated Products, Inc.'s Notice of Motion and Motion for Preliminary Injunction, hereafter, "Motion," Docket Item No. 19.)

## II. BACKGROUND

In a Complaint filed on February 4, 2009, Plaintiff alleges as follows:

Plaintiff is a Delaware corporation with headquarters in Sunnyvale, California.[2] Defendant Quintana purports to be the chief executive officer and founder of My-iButton, LLC, and resides in Westminster, California.[3] (Id. ¶ 5.)

Plaintiff is the owner and developer of the iButton product line ("iButton"), a computer chip enclosed in a 16mm-thick stainless steel can that delivers and records data. (Complaint ¶ 7.) Plaintiff is also the owner of four United States trademark registrations for the iButton mark, all of which have achieved incontestable status. (Id. ¶ 12.)

Defendants' My-iButton product is a portable MP4 promotional device that has a 2-inch LCD screen on which it displays videos or pictures. (Complaint ¶ 16.) It is worn by users on their bodies for advertising/display purposes. (Id.) Defendants, with at least constructive knowledge of Plaintiff's federal registration rights, adopted and used the trademark "My-iButton" in California and in interstate commerce for a portable electronic device. (Id. ¶ 15.) Most or all of the advertising and sales of the My-iButton product are conducted on the Internet, through Defendants' website, other Internet sites, and by and through product reviews in magazines. (Id. ¶ 16.) Defendants' first use of this mark did not occur until June 19, 2007. (Id.)

On April 24, 2008, Plaintiff became aware of Defendants' use of the My-iButton mark. (Complaint ¶ 20.) Plaintiff subsequently learned that Defendants had applied for a federal trademark registration for the mark "My-iButton." (Id. ¶ 21.) On April 30, 2008,

---

[2] (Complaint for Federal Trademark Infringement, False Advertising and Dilution and California Unfair Competition, Trademark Dilution and Declaratory Relief ¶ 3, hereafter "Complaint," Docket Item No. 1.)

[3] Although My-iButton, LLC has represented itself to be a California Limited Liability Company, the company is not registered with the California Secretary of State. (Declaration of Michael J. Ioannou in Support of Plaintiff Maxim Integrated Products, Inc.'s Motion for Preliminary Injunction ¶ 3, hereafter, "Ioannou Decl.," Docket Item No. 20.)

1  Plaintiff sent Defendants a "cease and desist" letter advising Defendants that the application
2  for trademark registration and use of the My-iButton mark infringed on Plaintiff's
3  incontestable marks for iButton. (Id. ¶ 23.) After no response, a further cease and desist
4  letter was sent. (Id. ¶ 24.) On November 26, 2008, Plaintiff filed an Opposition with the
5  Trademark Trial and Appeal Board with regard to Defendants' application for federal
6  registration of the My-iButton mark. (Id. ¶ 25.) Defendants continue to pursue registration
7  of the My-iButton mark with the U.S. Patent and Trademark Office ("PTO") and continue to
8  sell and distribute the My-iButton product. (Id. ¶ 26.)

9  On the basis of the allegations outlined above, Plaintiff alleges seven causes of action: (1)
10 Federal Trademark Infringement, 15 U.S.C. § 1114; (2) Federal Unfair Competition, 15 U.S.C. §
11 1125(a); (3) Federal Trademark Dilution, 15 U.S.C. § 1125(c); (4) Unfair Competition, Cal. Bus. &
12 Prof. Code §§ 17200, *et seq.*; (5) Dilution, Cal. Bus. & Prof. Code §§ 14330, *et seq.*; (6) False
13 Advertising, Cal. Bus. & Prof. Code §§ 17500, *et seq.*; and (7) Declaratory Relief.

14 Presently before the Court is Plaintiff's Motion for Preliminary Injunction.

## III. DISCUSSION

16 Plaintiff moves for a preliminary injunction on the grounds that it owns valid, protectable
17 and incontestable trademarks, and that Defendants are marketing and using a similar trademark that
18 has already caused confusion and threatens to dilute Plaintiff's intellectual property. (Motion at 1.)

19 To obtain injunctive relief, a plaintiff must establish (1) a likelihood of success on the merits,
20 (2) a likelihood of irreparable harm absent a preliminary injunction, (3) that the balance of equities
21 tips in favor of issuing an injunction and (4) that an injunction is in the public interest. Winter v.
22 Natural Resources Defense Council, — U.S. —, 129 S. Ct. 365, 374 (2008). Previously in
23 trademark cases, a plaintiff was entitled to a presumption of irreparable harm upon showing a
24 probable success on the merits. See GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1204-05
25 (9th Cir. 2000). However, in Winter, the Supreme Court held that "[i]ssuing a preliminary
26 injunction based only on a possibility of irreparable harm is inconsistent with our characterization of

injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, at 375-76.  Thus, a plaintiff is no longer entitled to a presumption of irreparable harm on the ground that it has shown a likelihood of success on the merits.  Volkswagen AG v. Verdier Microbus and Camper, Inc., No. C 09-00231, 2009 WL 928130, at *2 (N.D. Cal. Apr. 3, 2009); Cytosport, Inc. v. Vital Pharm., Inc., — F. Supp. 2d —, 2009 WL 1444535, at *6 (E.D. Cal. May 6, 2009).

The Court proceeds to consider whether a preliminary injunction is appropriate in this case using the factors articulated in Winter.

**A.     Likelihood of Success on the Merits**

The parties do not dispute the validity of Plaintiff's trademarks.[4]  (Motion at 5.)  The parties' dispute turns on whether Plaintiff has sufficiently shown that Defendants' mark creates a likelihood of consumer confusion.

To prevail on its trademark infringement action, a plaintiff must demonstrate (1) ownership of an enforceable right in a trademark and (2) that defendant's use of the mark creates a likelihood of consumer confusion.  See Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1354 (9th Cir. 1985) (*en banc*).  "The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." Abercrombie & Fitch Co. v. Moose Creek, Inc., 486 F.3d 629, 633 (9th Cir. 2007).  In determining whether or not there is a likelihood of confusion, a court is to weigh the following factors:  (1) the strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.  See AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).

---

[4] Plaintiff owns the following Trademarks on the PTO's Principal Register: Trademark Registration Nos. 2388023, 2388024, 2482685, 2478289.  (Ioannou Decl., Ex. Q.)

The similarity of the marks, proximity of the goods and marketing channels used, constitute "the controlling troika in the Sleekcraft analysis." GoTo.com, 202 F.3d at 1205. These three factors are the most important. See Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1055 n.16 (9th Cir. 1999).

**1.     Similarity of the Marks**

Plaintiff contends that this factor weighs in its favor because the marks are similar in sight, sound and meaning. (Motion at 13.)

The greater the similarity between the two marks at issue, the greater the likelihood of confusion. Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1144 (9th Cir. 2002). The Ninth Circuit has developed three principles that should be considered when assessing similarity: (1) marks should be considered in their entirety and as they appear in the marketplace; (2) similarity is best adjudged by appearance, sound and meaning; and (3) similarities weigh more heavily than differences. Id.

Here, with respect to appearance and sound, "My-iButton" incorporates "iButton" in its entirety. The trademarks utilize the same spelling. My-iButton appears, almost invariably, with a lower case "i" and an uppercase "B" in the spelling of "iButton."[5]  Thus, the only visual distinctions between the two marks as they are used in the commerce is that Plaintiff's "iButton" contains an underlined "i" and the term "My-" precedes Defendants' "iButton." However, Defendants' trademark application does contain some versions of its mark that are more distinguishable from Plaintiff's–"MYIBUTTON" and "My-ibutton." (Complaint, Ex. C.)

The Court finds that the two marks, as they appear in commerce are strikingly similar. See Perfumebay.com, Inc. v. EBAY, Inc., 506 F.3d 1165, 1174 (9th Cir. 2007) (holding that "eBay" and PerfumeBay" are similar). To the extent that there are differences, these are outweighed by the similarities between the marks as they are actually used. In addition, Plaintiff provides the transcript

---

[5] (See, e.g., Ioannou Decl., Exs. A, C-L; Declaration of Hal Kurkowski in Support of Plaintiff Maxim Integrated Products, Inc.'s Motion for Preliminary Injunction, hereafter "Kurkowski Decl.," Ex. A at 5, Docket Item No. 25.)

of a video entitled "Richard Quintana - CEO & Inventor of My-iButton," in which Defendant Quintana refers to his product as "the i-button." (Ioannou Decl., Ex. B.) In that context, the marks are indistinguishable. Thus, the Court finds that the similarity of the marks weighs strongly in favor of Plaintiff.

### 2. Relatedness of the Goods

Plaintiff contends that this factor weighs in favor of Plaintiff since the products provided by the parties are very similar types of products. (Motion at 17.)

Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods. Brookfield, 174 F.3d at 1055-56 "[T]he relatedness of each company's prime directive [is not] relevant." Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1131 (9th Cir. 1998). Instead, a court must focus on consumers and ask whether they are likely to associate two products. Id. Companies that offer products and services relating to the same general field can be sufficiently related for purposes of granting a preliminary injunction. See Brookfield, 174 F.3d at 1056; American Intern. Group, Inc. v. American Intern. Bank, 926 F.2d 829, 832 (9th Cir. 1991).

Here, there are some differences in the product markets for the iButton and My-iButton. The iButton has a broader range of functionality than the My-iButton, and their marketed uses do not appear to overlap. (Kurkowski Decl. ¶ 3; Ioannou Decl., Exs. A-C.) However, both parties sell goods in the general field of small portable electronics. For example, online product reviews of Defendants' My-iButton contain advertisements, linked to websites, for related products. (Ioannou Decl. Ex. C at 1.) For at least one product review, the first linked advertisement is for Plaintiff's iButton. (Id.) Based on this evidence, the Court finds that the relatedness of the products in the field of small portable electronics weighs in favor of Plaintiff.

### 3. Marketing Channels Used

Plaintiff contends that the use of a common marketing channels weighs in favor of Plaintiff since both parties advertise and sell their products primarily through the Internet. (Motion at 18.)

6

The use of "convergent marketing channels" increases the likelihood of consumer confusion. Sleekcraft, 599 F.2d at 353. "[T]he [internet], as a marketing channel, is particularly susceptible to a likelihood of confusion since . . . it allows for competing marks to be encountered at the same time, on the same screen." GoTo.com, 202 F.3d at 1207.

In this case, Plaintiff's evidence shows that Plaintiff and Defendants use the Internet as a significant marketing channel for their products. Defendants promote the My-iButton product online. (Ioannou Decl., Ex. B; Kurkowski Decl. ¶¶ 11-12, Ex. A.) Thus, this factor weighs in favor of Plaintiff.

### 4. Strength of the Mark

Plaintiff contends that this factor weighs in Plaintiff's favor because the iButton mark is both conceptually arbitrary and commercially strong.[6] (Complaint at 18-19.)

The stronger a mark, the greater protection it is accorded by trademark laws. Brookfield, 174 F.3d at 1058. The strength of the trademark is evaluated in terms of its conceptual strength and commercial strength. GoTo.com, 202 F.3d at 1207. More specifically, "[t]he strength of a mark is determined by its placement on a continuum of marks from generic, afforded no protection; through descriptive or suggestive, given moderate protection; to arbitrary or fanciful awarded maximum protection." E. & J. Gallo Winery v. Gallo Cattle, 967 F.2d 1280, 1291 (9th Cir. 1992). If a mark requires a consumer to use more than a small amount of imagination to form an association between the mark and the product, then the mark is suggestive and not descriptive. Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1218 (9th Cir. 1987). However, an otherwise inherently weak mark "may be strengthened by such factors as extensive advertising, length of exclusive use, [and] public recognition." Entrepreneur, 279 F.3d at 1144 (internal citations and quotation marks omitted).

---

[6] The Court notes that "in situations in which the appearance of the conflicting marks and the services provided are almost identical, 'the strength of the mark is of diminished importance in the likelihood of confusion analysis.'" GoTo.com, 202 F.3d at 1208 (citing Brookfield, 174 F.3d at 1059).

Here, the iButton marks have been in use for nearly ten years. (Ioannou Decl, Ex. Q.) Further, the marks only marginally describe the products in that they are small and resemble a button-like shape. (See Kurkowski Decl., Ex. A.) However, the marks do not describe the functionality of the products, and the addition of the term "i-" preceding "Button" requires an ordinary consumer to use some imagination in connecting the marks with the products. Thus, the Court finds Plaintiff's marks are conceptually strong.

In addition, the commercial strength of Plaintiff's marks bolsters their overall strength. Plaintiff has spent more than two million dollars advertising the iButton products. (Kurkowski Decl. ¶ 8.) Plaintiff has also had exclusive use of the iButton marks for nearly ten years. (Ioannou Decl., Ex. Q.) There are more than 175 million iButton products currently in circulation. (Kurkowski Decl. ¶ 7.) Thus, the Court finds the strength of the iButton marks weighs in favor Plaintiff.

### 5. Defendants' Intent in Selecting a Mark

Plaintiff contends that Defendants intentionally chose the name "My-iButton" to benefit from Plaintiff's goodwill and experience in the industry. (Motion at 19-20.)

A defendant's intent is only relevant to the extent that it weighs upon the likelihood that consumers will be confused by the defendant's mark and that it informs a court's view of the equities. Brookfield, 174 F.3d at 1059. To prove wrongful intent, evidence must show or allow for an inference that a defendant's mark was adopted to deliberately benefit from another's good will, good name, and good trade. Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 158 (9th Cir. 1963). Where a defendant knowingly adopts a mark similar to another's, the court may presume an intent to deceive consumers. Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1394 (9th Cir. 1993).

Here, Defendants describe the My-iButton as a light-weight audio/video media device. (Ioannou Decl., Exs. A-C.) However, Defendants applied for an International Class 26, "fancy good," trademark instead of an International Class 9, portable computer electronic device,

8

trademark.[7]  (Request for Judicial Notice, Ex. B, Docket Item No. 27; Ioannou Decl., Ex. P.) Defendants' decision to classify their product under Class 26 suggests that they intentionally avoided applying for a trademark that would be compared to Plaintiff's products.  However, Defendants submit the declaration of Defendant Quintana, in which he explains that he "sought advice of counsel regarding the availability of [their] proposed MY-iBUTTON mark. [His] then-counsel conducted a trademark search and advised [him] that [they] could properly proceed with registration. . . ."[8]  Based on this evidence, the Court finds that it cannot determine Defendants' intent at this time.  Thus, this factor is neutral with respect to whether Plaintiff has shown a likelihood of success on the merits.

### 6. Likelihood of Expansion in Other Markets

Plaintiff contends that Defendants' trademark is likely to expand into other markets, increasing the likeliness of confusion.  (Motion at 20.)

To determine the likeliness of expansion into other markets, "[t]he question is whether the parties are likely to compete with a similar product in the same market." Official Airline Guides, Inc., 6 F.3d at 1394.  "A strong likelihood that either party may expand his business to compete with the other favors a finding of [likely] infringement." Id.; Surfvivor Media, Inc. v. Survivor Productions, 406 F.3d 625, 633 (9th Cir. 2005).  However, where two companies already compete in the same product line to a significant degree, the expansion factor becomes relatively unimportant. Brookfield, 174 F.3d at 1060; GoTo.com, 202 F.3d at 1209.

As discussed above, for the purposes of determining likelihood of confusion, Plaintiff's iButton and Defendants' My-iButton are related products.  In addition, Plaintiff represents that it

---

[7] An International Class 9 trademark covers "data processing equipment and computers." U.S. Patent and Trademark Office, Trademark Manual of Examining Procedure § 1401.02(a) (5th ed. 2007).  An International Class 26 trademark covers "lace and embroidery, ribbons and braid; buttons, hooks and eyes, pins and needles; [and] artificial flowers." Id.

[8] (Declaration of Richard Quintana in Support of Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff Maxim Integrated Products, Inc.'s Motion for Preliminary Injunction ¶ 5, hereafter, "Quintana Decl.," Docket Item No. 32.)

plans to continue to expand the applications of its iButtons. (Kurkowski Decl. ¶ 15.) Plaintiff also submits evidence that it is expanding its sales internationally, and that Defendants have advertised that there are many languages available for their product. (Kurkowski Decl. ¶¶ 10-13; Ioannou Decl., Ex. M.) Thus, the Court finds that the likelihood of expansion of the parties' products tips in Plaintiff's favor.

### 7. Degree of Care Likely to be Exercised by Purchasers

Plaintiff contends that consumers do not exercise a significant care for Plaintiff's type of good. (Motion at 20-21.)

Courts look to what the reasonably prudent purchaser, using ordinary caution, would do to distinguish between the two product lines. Surfvivor, 406 F.3d at 634. When goods are more expensive, the court assumes purchasers will exercise greater care. E. & J. Gallo Winery, 967 F.2d at 1293; Official Airline Guides, 6 F.3d at 1393. For example, consumers exercise very little care with respect to inexpensive items, such as sun screen. Surfvivor, 406 F.3d at 634. However, there is no clear standard for moderately priced goods, such as non-designer clothing. Id.

Here, the parties' products both cost close to $50. (See Kurkowski Decl. ¶ 6.) In addition, the only other evidence addressing this factor shows that reviewers of computer-related products have exhibited a low-level of care by referencing Defendants' product as an "iButton." (Ioannou Decl., Exs. B, N.) Based on this evidence, the Court finds that an ordinary consumer is likely to exercise a low degree of care in distinguishing iButton and My-iButton products. Thus, the Court finds that this factor weighs in favor of Plaintiff.

### 8. Evidence of Actual Confusion

Plaintiff contends that actual confusion of consumers is likely, and may be inferred from the confusion exhibited by online reviews and advertisements. (Motion at 21.)

Evidence of past actual confusion is persuasive proof that future confusion is likely in a trademark infringement lawsuit. GoTo.com, 202 F.3d at 1208; Official Airline Guides, 6 F.3d at 1394. Courts often rely on three types of evidence: (1) evidence of actual instances of confusion; (2)

survey evidence; and (3) inferences arising from judicial comparison of the conflicting marks and the context of their use in the marketplace." Cytosport, 2009 WL 1444535 at *14. Since actual confusion is difficult to prove, it is not necessary to do a survey before obtaining a preliminary injunction. Sleekcraft, 599 F.2d at 353.

Here, as discussed above, the actual instances of confusion, are not actual consumers, but product reviewers. Although Plaintiff has submitted evidence that internet advertisements for Plaintiff's products have been shown along with a product review of Defendants' product, there is no evidence in the record of actual consumer confusion. Thus, the Court finds the lack of evidence of actual confusion weighs in favor of Defendants.

In sum, the Court finds that each of the Sleekcraft factors, except Defendants' intent in selecting the mark and the evidence of actual confusion, weigh in favor of Plaintiff's contention that there is a likelihood of confusion. Accordingly, since the parties do not dispute Plaintiff's ownership of valid and protectable trademarks, the Court finds that Plaintiff has established a likelihood of success on the merits.

**B.     Likelihood of Irreparable Harm**

Plaintiff contends that irreparable harm has already occurred, and that further irreparable harm is imminent absent an injunction.[9] Defendants contend that they have ceased selling the My-iButton product and disabled their website, making irreparable harm unlikely. (Opposition at 5-6.)

A plaintiff seeking a preliminary injunction must demonstrate more than a likelihood of success on the merits of its claims. Winter, 129 S. Ct. at 375-76. A plaintiff must also demonstrate a likelihood that absent the injunction, it will be irreparably harmed by defendant's alleged infringing conduct. Id.; Volkswagen AG, 2009 WL 928130 at *6. In trademark cases, irreparable harm is typically found in a plaintiff's loss of control over their business reputation, loss of trade and loss of goodwill. Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir.

---

[9] (Plaintiff Maxim Integrated Products, Inc.'s Reply in Support of its Motion for Preliminary Injunction at 5, Docket Item No. 36.)

11

1990). Irreparable injury exists where a court reasonably concludes that continuing infringement will result in loss of control over the plaintiff's reputation and good will. Apple Computer, Inc. v. Formula Int'l Inc., 725 F.2d 521, 526 (9th Cir. 1984); see also Volkswagen AG, 2009 WL 928130 at *21.

Here, Plaintiff has submitted evidence showing that Defendants' My-iButton has been consistently referred to as the "iButton," including in a negative product review of the My-iButton and in an internet interview with Defendant Quintana. (Ioannou Decl., Exs. B, N ¶ 15.) In response, Defendants represent that they have ceased selling the My-iButton and have taken down their website.[10] However, Defendants do not indicate whether they have ceased manufacturing or using My-iButton products.[11] In light of Plaintiff's evidence showing that it has already lost some control over its business reputation and goodwill, and Defendants' lack of evidence with regard to whether their manufacture and use of My-iButton products will continue in the future, the Court finds that Plaintiff has adequately shown that irreparable harm is likely absent a preliminary injunction.

**C.     Balance of the Equities**

A plaintiff seeking a preliminary injunction must establish that the balance of equities tips in his favor. Winter, 129 S. Ct. at 374. A court balancing the equities will look to the possible harm that could befall the various parties. See Cytosport, 2009 WL 1444535 at *22.

As discussed above, denying a preliminary injunction is likely to result in irreparable harm to Plaintiff's business reputation and good will. In contrast, Defendants are likely to suffer only minor harm since, as they concede, they have not sold the My-iButton product since September 2008, and they no longer offer their My-iButton product for sale. (Quintana Decl. ¶ 4.) Additionally, Plaintiff represented at oral argument that it is willing to post a bond to protect Defendants' interest pending

---

[10] (Opposition at 6; Morales Decl. ¶ 2.)

[11] Defendants represent that they will cease any allegedly infringing conduct identified by Plaintiff pending the resolution of this action. (Opposition at 5.)

the outcome of this litigation. Accordingly, the Court finds that the balance of equities favors the issuance of a preliminary injunction.

**D.     Public Policy**

Finally, a court must consider whether an injunction is in the public interest. See Winter, 129 S. Ct. at 374. In the trademark context, courts often define the public interest as the right of the public not to be deceived or confused. Moroccanoil, Inc. v. Moroccan Gold, LLC., 590 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008) (quoting Opticians Ass'n, 920 F.2d at 198). In light of the Court's finding of a likelihood of confusion between the marks, the Court finds that the public interest weighs in favor of granting an injunction.

Accordingly, the Court GRANTS Plaintiff's Motion for Preliminary Injunction.

## IV.  CONCLUSION

The Court GRANTS Plaintiff's Motion for Preliminary Injunction. A separate Order will be issued with the language of the preliminary injunction. Plaintiff shall post a $40,000 bond within ten (10) days from the date of this Order.

The parties shall appear for a Case Management Conference on **August 31, 2009 at 10 a.m.** On or before **August 21, 2009**, the parties shall file a Joint Case Management Statement. The Statement shall include, among other things, a proposed expedited schedule for proceeding with the remainder of this case, a good faith discovery plan with a proposed date for the close of all discovery, and an update on any settlement efforts.

Dated: July 16, 2009

JAMES WARE
United States District Judge

13

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

David P. Morales moraleslaw@sbcglobal.net
Lita Monique Verrier lverrier@rmkb.com
Michael J. Ioannou mioannou@rmkb.com

**Dated:  July 16, 2009**                                      **Richard W. Wieking, Clerk**

                                                               **By:   /s/ JW Chambers**
                                                                        **Elizabeth Garcia**
                                                                        **Courtroom Deputy**